19-1190 Highlands Ranch Neighborhood v. Cater. Go ahead, please. Thank you, Your Honor. May it please the court and counsel, I'm David Feeder, and I represent the plaintiff appellant in this matter, the Highlands Ranch Neighborhood Coalition. This case is the latest chapter in a five and a half year odyssey for my client, which is comprised of a group of homeowners in Highlands Ranch, Colorado. They fought tirelessly against both the odds and the power of the state and federal highway authorities with only one objective, and that is to make the defendants follow their own established protocols and guidelines for evaluating and remediating traffic noise for their C-470 expansion project. My client is here today seeking justice from this court and respectfully requests that it hold the defendants accountable for their arbitrary and capricious actions. This case revolves around the defendant CDOT's years long C-470 expansion project, which has significantly expanded a 13.75 mile stretch of Colorado State Highway C-470 in the southwest Denver metro area. Now, the size and the scope of the C-470 project is considered a large corridor project, and that's an important distinction for the issues presented in this case. Under the National Environmental Protection Act, or NEPA, there was in 2015 an environmental assessment that was issued for the project, and it was required to include an analysis of potential traffic noise impacts. For federally aided highway projects such as this, NEPA requires implementation of state-specific guidelines that must comply with federal guidelines. Now, relevant to this case, CDOT adopted state-specific noise analysis and abatement guidelines, which I'll refer to as the 2015 Colorado Guidelines. And those guidelines were approved by the defendant Federal Highway Administration. And indeed, the introduction to those state and federally approved guidelines specifically states that they are based on currently accepted best management practices and procedures used by federal and state transportation agencies, and that they will be subject to review every three years. Now, these guidelines were initially adopted in 2011, and they were updated both in 2013 and 2015. When these Colorado state-specific guidelines were initially adopted in 2011, they what is referred to as a 2006 user's guide. Now, importantly, CDOT continued to include this 2006 user's guide in both the 2013 and 2015 updates to its guidelines. And the requirements of the 2006 user's guide are of critical importance to this case. You use the word requirements. The user's guide itself speaks of itself as recommendations. It does that at least twice. And I mean, it seems isn't the predicate of your argument that somehow or other there was an obligation of the agencies to apply the provisions of the 2006 user's guide. If the user's guide itself does not describe itself as a requirement, then why should the agencies deem it to be such? Your Honor, that's a very good question. And the key is the language is mandatory in multiple places. First of all, it is state-specific guidelines, which show that they take precedence over federal guidelines. But more importantly, the 2015 guidelines themselves refer to this user's guide as the protocol for the use of validating traffic noise models in CDOT projects. And indeed, in section 3.3 of those guidelines, it states that the 2006 user's guide represents, in fact, what it specifically calls the standard validation practices for the TNM that's at issue here. So we submit that these are not just mere recommendations. By their own terms, by the own terms of CDOT's 2015 state-specific guidelines, it established the 2006 user's protocol and the standard validation practices that are specifically applicable to this case. And with regard to this case, that's section 3.3 of the 2015 guidelines. OK, thank you. Mr. Feder, let me ask you about that. Is it at least ambiguous if you have the 2006 user's guide that expressly refers to itself as recommendations and you have language in 3.2.2 and in 3.3 that don't specifically say we are incorporating all of the provisions of the user's guide, but as you point out, for example, in 3.3, it just says that the standard validation practices are described in Appendix C. Is it at least ambiguous in terms of whether 3.2.2 or 3.3 have, in essence, obligated CDOT to use all of the terms in the user's guide, even though it had described itself as recommendations? In other words, you have an anomalous situation. You have clearly recommendations and then you have documents that are referring to it in the 2015 guidelines. And that seems to create an ambiguity. Am I wrong about that? Well, Your Honor, I don't see that as an ambiguity. What I see is that the guidelines included that user's guide as an appendix. And I believe the appropriate way to look at this is that the guidelines should be read as a whole entire document. And that user's guide is part of the entire document. You have to read it all together. And I think it is a fair characterization to say that the guidelines adopted all of those recommendations by including it not only in the 2011 guidelines, but when they updated the guidelines in 2013 and again in 2015. To the extent there was any ambiguity there, that's all on CDOT. And they have had multiple opportunities, nine years now, to clarify any ambiguity there. So I would say to the extent that it could be deemed ambiguous, I think that needs to be held against the people who drafted the document and established this. And again, these are establishing specific protocols. And they have specific protocols. And they set out different scenarios for medium-sized projects or large-sized projects. So again, these aren't just, I don't think they can be just deemed as recommendations and ambiguities within the document. It is one entire document that governs this entire process, a specific technical scientific process. Why is Mr. Rudell's or Ms. Gibson's interpretation unreasonable? I'm sorry, could you repeat that, Your Honor? Why is Mr. Rudell or Ms. Gibson's explanation for the incorporation of the User's Guide in 2011 unreasonable? The explanations given by the declarants in this case are simply post-hoc rationalizations. They are attempting to, there are assertions that, well, this was just a mere remnant of previous protocols or something that wasn't really important. Yet, they put it in there. They put it in there in 2011. And they kept it there in 2013. They kept it there in 2015. And again, when they first put it in in 2011, that was just two years before the noise measurements that were taken in this case were actually conducted here. And I would submit, if they were truly irrelevant, if the requirements that they are now saying are irrelevant, not applicable, remnants, whatever words you want to use from all of their assertions, they had the duty to correct that. And they never did. Never did over nine years. Why is it a post-hoc rationalization if those were two of the individuals that participated in the decision in 2011 to incorporate the User's Guide? It seems to me that it's regulatory history as opposed to a post-hoc rationalization. But why is that wrong? I think the regulatory history is the document that was approved by the Colorado Department of Transportation, and again, approved based on a four-year scientific study. The 2006 User's Guide that's at issue here was developed over a four-year Colorado state-specific study, a technical scientific process that was included there. They included that. That was the state-of-the-art in 2011. They chose to do that. And they've chosen to keep that in there in 2013, 2015, and every opportunity after that. And for them to suggest, again, these suggestions now don't have anything to do with the actual decision-making that took place. What the defendants now want you to believe is that they put that in there and they've kept it in there year after year after year, but they didn't really need to, and it doesn't really serve any purpose, even though they refer to it explicitly themselves as the standard validation practices in their protocol. You're setting up this binary choice, and it seems to me it's a false choice. I mean, they didn't say it was irrelevant, and they didn't say that the guide didn't have value. They just said that it does not command their action on this specific point. And I mean, so why is it problematic? Oh, two questions. Why is it necessarily problematic to include the guide for what it's worth, one, and you say any ambiguity is on CDOT, but why is it on CDOT when our standard is, are they acting in an arbitrary, unreasonable fashion? So let's assume there was an ambiguity. Well, if they construed and navigated that ambiguity in a reasonable fashion, where's the basis for a problem there, a liability? So those two questions. Sure, Your Honor. In terms of the, you know, why was it included and why should that be unreasonable there? I think the key is that when it was adopted in 2013, and I'm sorry, Your Honor, could you repeat, again, I'm taking notes on the second question. Could you repeat what your first question was? Sure. I guess what I was critiquing and trying to understand better on the first point was this is not really a binary choice, is it? I mean, the question is not, they have to deem this appendix C irrelevant or not. They aren't claiming it is irrelevant. Are they, even in the declarant statement, they're not claiming it's irrelevant. They're just claiming that it has certain value, right? Yeah, because as I understand it- Your Honor, I would disagree. Why keep including it over and over and over again if it's irrelevant? That's what I thought I heard you saying. Is that not the gist of the position you were taking here? Your Honor, for purposes of this case, they have effectively taken the position that it is irrelevant because with regard to this case, a large corridor project, they have chosen to ignore the specific requirement set forth for large corridor projects and said, we're only gonna look at a different validation method, which is only applicable under these guidelines to medium-sized projects. So in effect, they are ignoring that and picking and choosing what they want to use and what they don't wanna use. So that's the reality of what they've done. But again, in order to accept the defendant's positions in this case, you have to essentially believe that these knowledgeable scientists essentially put in a requirement there that they are choosing not to follow and not to ignore, and they have determined they'll use, they'll pick and choose whatever they want, whenever they want. All right, well, all right, I understand. I thank your response then to the first point. The second point goes to the ambiguity point that following up on Judge Bacharach's earlier inquiry. Let's assume it is ambiguous. I thought I heard you say something like it's on CDOT as if this is a fault situation. This is not a question of whether who's right or who's wrong in that sense. The point is if it's ambiguous and they come up with a reasonable way to thread the needle, then why is there a violation of their obligation as an agency? That's my question. Let's assume it is ambiguous. Let's assume it's not clear. If they come up with a reasonable way to discern how to deal with the tension between recommendations and the languages in the 2015 document, if they come up with a reasonable way to say, I'll take portions of the appendix C, but not all of it, why is that, why would that incur an arbitrary matter of decision-making? Why would that be deemed an arbitrary matter of decision-making? Your Honor, under the applicable standard, the defendants are required to consider all of the relevant facts and they are required to offer an explanation as to why that happened. Now, in this instance, the whole crux of this case is whether they considered all of the relevant facts. And I would submit in this case, they never did. They have long-term noise data measurements that they took. They've just never validated this project with that information. All we're asking them to do is to do what they're required to under these state-specific requirements that they created and just do the analysis. It's sitting right there for them. And their explanations are by not looking at the relevant data, by not following that, they have essentially acted arbitrary by failing to follow their own guidelines. And the explanations, threading the needle isn't the standard. The standard is, have they considered all of the evidence and have they provided a plausible explanation? In this instance, I would submit they have not supplied. The only explanations are post-hoc rationalizations. They run counter to the evidence and therefore are so implausible that they cannot be considered the product of agency expertise and are therefore arbitrary and capricious and should be rejected in this case by the court. And this court should hold that NEPA was violated. And Your Honor, I see I'm way over time. Have I addressed your question? You have, and yes, we'll end it right there. Thank you very much, counsel. I appreciate it. Thank you. Now hear from Appaluse, please. Good morning, Your Honors, and may it please the court. I am Evelyn Ying on behalf of the Federal Highway Administration. Plan to reserve five minutes, if I can, of argument time for Andrew Gomez, counsel for co-appellee appearing on behalf of the Colorado Department of Transportation. Now here, the district court did correctly conclude that the agencies have complied with the procedural requirements of NEPA in their evaluation on appeal challenges only the validation of the traffic noise model used for this. But the use of long-term noise measurements and model validation is not legally required. And as the district court here concluded, the agency's decision to use the short-term measurements to validate the noise model was not arbitrary or capricious under the highly deferential standard of the APA that applies here. And that rational decision was consistent with the 2015 Colorado noise guidelines, longstanding practices of CDOT and current industry standards. And it was based on the exercise of the technical knowledge and discretion of the noise analyst on this project on matters within the agency's expertise to which the courts routinely defer. Now, the record here supports the reasonableness  to validate the model. All the parties agree that the 2015 Colorado noise guidelines adopted by CDOT and approved by Federal Highway Administration to comply with 23 CFR 772, which are the federal regulations that apply here are the policies that the state follows for the noise analysts here. And that is what the CDOT did here. They collected noise levels and traffic data for 10, 20 minutes at two different times at 15 representative locations in the study area in order to validate this particular model. And this is consistent. Ms. Jing, if you put aside the 2006 user's guide for a moment, what in 3.2.2 or in 3.3 tells an administrator or a state authority how to validate a TNM model? Whether or not 15 places of measurement is sufficient, whether short-term readings are sufficient. Point me to the language in those two provisions that would be how to do it. Certainly, Your Honor. For example, in 3.2.2, it says a minimum of two existing field measurements are required with the study zone. Only two is, what we're doing here is validating. To short-term or long-term? Well, it goes on to explain, Your Honor, that in measurements are taken at any time. However, it's best to measure when the traffic is relatively free-flowing at or near the posted speed limit. And that was what happened here. We have a highway where the short-term measurements were taken when it was free-flowing traffic, and it's a high volume, and it followed that process here. And it also goes on to say for high-volume roads, which the C-470 is, a 10-minute sample is usually statistically accurate enough to attain a good measurement. But sample times of 30 minutes may be necessary, but here it wasn't necessary because it actually validated. After the CDOT plugged in those numbers, based on the field data that they had collected and measured it against the model results, they came within the margin of error, which is three decibels, and therefore they validated. And it makes sense because noise measurements and traffic data are converted into a one-hour timeframe for the model. And so because one-hour equivalent sound level is the standard measure of time, a noise meter that measures sound for 15 minutes or 10 to 20 here is adjusted. And so there's just no reason to need a long-term measurement to validate the model here. And the record is clear that collecting that data using these short-term timeframes is the industry standard, and certainly the consistent and uniform practice of CDOT for many years. And it also is consistent with federal highway guidance on highway traffic noise analysis. Now, the coalition here, though, relies solely on the 2006 user's guide to argue that long-term measurements are required. But as just Holmes pointed out, the guide on its face in several areas, including talking about the validation of the models, is very clear that the guide only provides, quote, recommendations, and that these are just in section four levels of something to think about, but they're not actually required. And as the agency explained in numerous places, including the declarations, the purpose of the guides were limited here. And it was, first of all, to provide guidance to the noise analysts and the input of adjustment factors, where data in the model, that it was the only place at that time in the beginning where this information was available to noise analysts. These models can be quite complicated, and so it was to help with this new model. And second of all, to provide additional practices to consider when a model fails to validate. That doesn't apply here because the model did validate. Well, and that's if you credit the explanation, but if you simply look at the face of 3.2.2 and 3.3 and the guidelines themselves, why is it an unreasonable interpretation to say that even though the user's guide was a set of on its face recommendations, as Mr. Feeder argues, it was in effect incorporated because the guidelines, as he points out, specifically characterize them as the protocol or the case of 3.3 as the standard validation practices. So in essence, he's arguing that the guidelines obligated CDOT to apply the user's guide, even though it on its face was recommendations because it was incorporated as the protocol. Those are good points, your honor. And I want to make clear that what we're saying is that, no, we shouldn't ignore the user's guide, but even if what the other side has stated is to take those terms in isolation and our position is that when they're read together and in the context here, they support the position that I've just stated that the user's guide was there for limited purpose. For example, if you look to, let's turn to the reference to the protocol in 3.2, they're talking a lot about technical measurements and that sort of thing. And so when they talk about protocol for the use of TNM, they are talking about referring to the first part of the guide, which provides guidance on how to input data into the traffic model. And as the reference to standard validation practices in guideline 3.3, that in essence is, if you look at the context of that particular paragraph, it's talking about situations where the model does not validate. And then it refers to the user's guide as perhaps providing some different ways that the noise expert can come up with to help it validate the model. And in fact, it's not the only thing it references. That statement actually references also a traffic noise model frequently asked questions and it provides a link. And if you look at that link, that link provides different adjustment factors, input models, and that sort of thing that helps a noise analyst be able to do some things that in case the model doesn't validate. And here it did validate, so it didn't have to refer to that. And in fact, the text, it followed the text of the guidelines, which is really controlling here. So I wanted to make sure that- So you're saying that that language there, standard validation referred to, really it read in context, was addressing the problem of non-validation when it doesn't validate. And when it doesn't validate, then the 2006 user's guide does come in handy as a way to address that issue. That's correct, Your Honor. That's exactly correct. That in the situation where the short-term measurements or the model does not validate, then what the noise analyst has to do is go back and do correction factors or figure out different inputs or explain why it didn't, or it has to take more measurements. And that point, what that statement, as the declaration, as Stephanie Gibson explained, goes to provide certain other options that an analyst might be able to do. I see that my time is running down. I do want to allow the State Council to be able to present arguments. So if there are no further questions- That's fine, Ms. Shin. Thank you. Good morning, Your Honors, and may it please the Court, like my co-counsel stated, my name is Andrew Gomez and I represent the Colorado Department of Transportation in this matter. A lot of focus has been on the technical aspects, and I want to kind of move the Court back to the issue at hand, which is NEPA. As this Court is aware, NEPA requires a, quote, hard look at environmental consequences. And here there could be no question that both the intent and legal requirements of NEPA have been satisfied. CDOT and FHWA went above and beyond what is required of NEPA by extending its notice and comment period specifically for the plaintiff, and actually collected extra data above what is required of NEPA. This included taking long-term measurements and responding and writing to all of the association's concerns. Second, the federal regulation at issue 23 CFR, section 772, subsection 11, requires that highway agencies determine and analyze traffic noise impacts. Here, the 115-page traffic noise technical report included in the environmental assessment satisfies that requirement. It shows the detailed steps taken with respect to noise measurements and validation of the traffic noise model. This can be found at volume three of page 531. That is the attachment to the environmental assessment. And in satisfying this requirement, CDOT did not act in an unreasonable way. This is again demonstrated by the agency declarations where they show their work, so to speak. And importantly, the methodology used to validate the noise model was scientifically correct, as Mr. Sly and Mr. Rudl both made clear in their declarations. And I would urge this Court to read those declarations closely. Those begin on volume six on page 1415. And so this leads to the 2015 and 2006 guidance documents, which are, of course, disputed here. And as this Court is aware, an agency is entitled to deference on matters technical in nature, and an exception should not be made here. To effectively- You're not arguing that there should be our deference, are you? I'm sorry, can you say that again? You're not suggesting that there's our deference, are you? It could rise to that level, Your Honor. This is a, you know, this is a guide. These are guidance documents. These are not regulations. These do not have the force of law. To, you know, accept the plaintiff's position would be to throw out decades of professional expertise and replace it with a selectively quoted sentence and an appendix to the 2015 guidelines. And again, these have been explained in a rational and a coherent way. There's nothing unreasonable about that. And to your earlier question, if there is any ambiguity between 2015 and the 2006 guidelines, the agency's discretion is meant to resolve that ambiguity, if any. Nothing requires a continuation of the 2006 user guide practices. And even if it did, it does not contain the results that the plaintiff seeks here. And so, like I said, the 2006 guidelines are not, it's not a regulation. And while it can certainly paint the edges of what is arbitrary and capricious, they are by no means meant to be inflexible as a guidance document. It's not a cookbook recipe. It does not require a lockstep method. Each project's gonna be different. There's different landscaping requirements, different lane configurations. And this is where I would urge the court to defer to agency expertise on each of these projects. And again, if the court looks to the explanations and the declarations, these are made clear. Arbitrary and capricious, in our view, would be if the agency used an unvalidated model with older software. Again, short-term has been used as the industry standard for, I believe, the last 10 years. So there was nothing improper about using short-term modeling, or short-term measurements, rather. And as I believe Judge Holmes made clear, 2006 was considered. I think it'd be erroneous to say that the 2006 User Guide was not considered at all, or that it was irrelevant. It is meant as a reference document, and as Judge Bacharach says, it demonstrates good regulatory history. And there's nothing unreasonable in reaching that decision in terms of how to not rely on the 2006 User Guide. And as my co-counsel made clear, it's meant as a tool in case your model does not validate. But as the case is here, the model did validate, and there was no need to rely on the 2006 User Guide. I see that my time is up, and I would just state in closing that the record makes clear that CDOT and FHWA did not act arbitrary and capricious in validating its noise model, and to respectfully request that this Court affirm the District Court. Thank you. Thank you, counsel. Thank all of you for your fine arguments, cases submitted.